## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** )<br>)<br>) | |
| **Plaintiff,** ) | **CIVIL ACTION NO.** |
| ) | |
| **v.** ) | **COMPLAINT** |
| ) | |
| **NORFOLK SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY,** )<br>)<br>) | **JURY TRIAL DEMANDED** |
| ) | |
| **Defendants.** ) | |

NATURE OF THE ACTION

This is an action under Title I of the Americans with Disabilities Act of 1990, as amended ("ADA"), and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of disability and to provide appropriate relief to the individuals identified below, as well as other presently unidentified individuals.  As alleged with greater particularity in paragraph(s) 20-182 below, Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company ("Defendants") subjected a class of individuals to unlawful discrimination on the basis of their actual disabilities, records of disability, or because they were regarded as disabled; denied reasonable accommodations to individuals with disabilities; and used qualification standards that screened out or tended to screen out individuals with disabilities.

JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by

reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§ 2000e-5(f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.     The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the Western District of Pennsylvania and other jurisdictions.

PARTIES

3.     Plaintiff, the U.S. Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title I of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4.     At all relevant times, Defendant Norfolk Southern Corporation ("NSC"), a Virginia corporation, has continuously been doing business in the State of Pennsylvania and the city of Pittsburgh and has continuously had at least 15 employees.

5.     At all relevant times, Defendant NSC has continuously been an employer engaged in an industry affecting commerce under Sections 101(5) and 101(7) of the ADA, 42 U.S.C.§§ 12111(5) & (7).

6.     At all relevant times, Defendant NSC has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

7.     During the period January 1, 2009 to present, NSC has continuously employed more than 500 employees.

8.     At all relevant times, Defendant Norfolk Southern Railway Company ("NSRC"),

a Virginia corporation, has continuously been doing business in the State of Pennsylvania and the city of Pittsburgh and has continuously had at least 15 employees.

9.     At all relevant times, Defendant NSRC has continuously been an employer engaged in an industry affecting commerce under Sections 101(5) and 101(7) of the ADA, 42 U.S.C.§§ 12111(5) & (7).

10.     At all relevant times, Defendant NSRC has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

11.     During the period January 1, 2009 to present, NSRC has continuously employed more than 500 employees.

12.     NSRC is a wholly-owned subsidiary of NSC.

13.     NSC maintains an internal medical department ("NSMD").  The NSMD gathers medical information about job applicants applying for jobs with NSRC and NSRC personnel, and NSMD evaluates that information to determine if an applicant or employee is to be medically disqualified from the position they sought or held.

ADMINISTRATIVE PROCEDURES

14.     More than thirty days prior to the institution of this lawsuit, Jessie Blankenship, Randy Nosal, Jason Phipps, Rashad Robinson, Jonathan Ryan, Philip Tyson, Terry Vogel, and Robert Workman filed charges with the Commission alleging violations of the ADA by Defendants.

15.     On various dates between October 2011 and July 2015, the Commission issued to Defendants Letters of Determination finding reasonable cause to believe that the ADA was violated and inviting Defendants to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate

relief.

16.     The Commission engaged in communications with Defendants to provide Defendants the opportunity to remedy the discriminatory practices described in the Letters of Determination.

17.     The Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

18.     On September 28, 2016, the Commission issued to Defendants Notices of Failure of Conciliation.

19.     All conditions precedent to the initiation of this lawsuit have been fulfilled.

<u>STATEMENT OF CLAIMS</u>

20.     Since at least July 16, 2008, Defendants have engaged in unlawful employment practices at their facilities in Pittsburgh, Pennsylvania, and all other facilities and business operations company-wide, in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A), 102(b)(6) and 102(d)(4)(A) of Title I of the ADA, 42 U.S.C. §§12112(a), 12112(b)(1), 12112(b)(5)(A), 12112(b)(6), & 12112(d)(4)(A), that adversely affect job applicants and employees who were subjected to the policies and practices of Defendants.  Specifically, Defendants failed to hire job applicants or medically disqualified employees from further employment because of their actual disabilities, records of disability, or because they were regarded as disabled; denied reasonable accommodations to individuals with disabilities; engaged in unlawful disability-related inquiries/examinations; and used qualification standards that screened out or tended to screen out individuals with disabilities.  The unlawful practices include the following:

<u>Jason Phipps</u>

21.     At all relevant times, Jason Phipps was a person with a disability under Section

3(1)(A) and (C) of the ADA, 42 U.S.C. § 12102(1)(A) & (C).  At the time of his application for employment with Defendants, Phipps had a physical impairment, lymphoma, that substantially limited one or more major life activities, and Defendants, acting through their internal medical department, regarded Phipps as having a disability by medically disqualifying him and denying him hire as a conductor because of his non-transitory and non-minor impairment, lymphoma, and related chemotherapy treatment.

22.     Phipps applied for a conductor position at Defendants' Louisville, Kentucky facility in 2011.

23.     Defendants required Phipps to undergo a pre-employment medical examination and inquiries during which he disclosed that he had been diagnosed with a form of cancer, lymphoma, that he had been receiving treatment, and that he was scheduled for two additional chemotherapy treatments in the coming months.  Phipps began his chemotherapy treatment in November 2009.

24.     At all relevant times, Defendants have maintained and applied a medical standard that bars job applicants and employees in certain positions, including but not limited to conductors, who receive certain medical treatments, including but not limited to chemotherapy, from working in those positions until they have been treatment-free for a certain period of time, without regard to the actual effects of the treatment on the applicant or employee.

25.     Defendants refused to hire Phipps because he was receiving chemotherapy treatment for his lymphoma, requiring him to have a period of six months without treatment, without consideration of how the chemotherapy actually affected Phipps' ability to safely perform the essential functions of the conductor job.

26.     Defendants, through NSMD, medically disqualified Phipps and refused to hire

him as a conductor because he was receiving chemotherapy for lymphoma.

27.     Defendants failed to provide reasonable accommodation to Phipps for his disability, in the form of an exemption from their blanket policy, based on an individualized assessment of Phipps' actual experience with the effects (or lack thereof) of the chemotherapy treatment.

28.     Defendants refused to hire Phipps on the basis of actual disability, lymphoma, and because he was regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Class of Employees and Job Applicants Disqualified for Cancer Chemotherapy</u>

29.     Since at least July 16, 2008, Defendants have maintained and applied a medical standard that bars job applicants and employees in certain positions who receive chemotherapy as a medical treatment from working in those positions until they have been treatment-free for a certain period of time, without regard to the actual effects of the treatment on the applicant or employee.

30.     Since at least July 16, 2008, Defendants have refused to hire a class of presently unidentified job applicants with actual disabilities, and whom they regarded as disabled, because those persons were receiving chemotherapy treatment for cancer, requiring them to have a certain period without chemotherapy treatment, without consideration of whether, or to what extent, the chemotherapy actually affected their ability to safely perform the essential functions of the positions they sought.

31.     Since at least July 16, 2008, Defendants have medically disqualified from employment a class of presently unidentified employees with actual disabilities, and whom they regarded as disabled, because those persons were receiving chemotherapy treatment for cancer,

requiring them to have a certain period without chemotherapy treatment, without consideration

of whether, or to what extent, the chemotherapy actually affected their ability to safely perform

the essential functions of the positions they held.

32.     Defendants failed to provide reasonable accommodation to a class of job

applicants and employees for their disabilities (cancer), in the form of an exemption from

Defendants' blanket policy and practice, based on an individualized assessment of the job

applicants' and employees' actual experience with the effects (or lack thereof) of the

chemotherapy treatment.

33.     Defendants refused to hire a class of presently unidentified job applicants on the

basis of actual disability, cancer, and because they were regarded as disabled in violation of

Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a),

12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

34.     Defendants medically disqualified from employment a class of presently

unidentified employees on the basis of actual disability, cancer, and because they were regarded

as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA,

42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Terry Vogel</u>

35.     At all relevant times, Terry Vogel was a person with a disability under Section

3(1)(A) and (C) of the ADA, 42 U.S.C. § 12102(1)(A) & (C).  At the time of his employment

with Defendants, Vogel had a physical impairment, diabetes, that substantially limited one or

more major life activities, and Defendants, acting through their internal medical department,

regarded Vogel as having a disability by medically disqualifying him and placing him on

indefinite, unpaid medical suspension as a conductor because of his non-transitory and non-

minor impairment, diabetes.

36.     Vogel was first diagnosed with Type 1 diabetes in 2003, and is insulin-dependent.

37.     At all relevant times, Vogel worked as a conductor out of Defendants' Allentown, Pennsylvania facility.

38.     During a periodic medical examination in June 2011, Defendants discovered that Vogel's blood sugar levels were elevated.  Defendants did not place Vogel on medical suspension at that time, but rather requested medical records relating to his diabetes, which were provided in October 2011.

39.     On December 19, 2011, Defendants, acting through NSMD, placed Vogel on unpaid medical suspension, claiming that his diabetes was not well controlled.  Vogel's personal physician released Vogel to return to work on March 30, 2012, but Defendants refused to return Vogel to his conductor job until November 8, 2012.

40.     At all relevant times, Defendants maintained and applied a medical standard that bars diabetic employees in certain positions, including but not limited to conductors, from working in those positions if Defendant deemed them to have uncontrolled diabetes, regardless of the actual effect of the individual's diabetes on the person's ability to safely perform the essential functions of the job.

41.     Defendants medically disqualified Vogel and placed him on unpaid, indefinite suspension because of his diabetes and related blood glucose level without consideration of whether, or to what extent, his condition actually affected his ability to safely perform the essential functions of the conductor job.

42.     Defendants failed to provide reasonable accommodation to Vogel for his disability, in the form of an exemption from their blanket policy, based on an individualized

assessment of Vogel's actual experience with the effects (or lack thereof) of his diabetes and blood glucose levels.

43.     Defendants medically disqualified Vogel and placed him on unpaid, indefinite suspension on the basis of actual disability, diabetes, and because he was regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Class of Employees and Job Applicants Disqualified for Diabetes and Related Conditions</u>

44.     Since at least July 16, 2008, Defendants maintained and applied medical standards that barred diabetic job applicants and employees in certain positions from working in those positions if, under Defendants' medical guidelines and protocols, those persons were deemed to have uncontrolled diabetes, regardless of the actual effect of the individual's diabetes on the person's ability to safely perform the essential functions of the job.

45.     Since at least July 16, 2008, Defendants have refused to hire a class of presently unidentified job applicants with actual disabilities, and whom they regarded as disabled, because Defendants deemed those persons to have uncontrolled diabetes, without consideration of whether, or to what extent, their diabetes actually affected their ability to safely perform the essential functions of the positions they sought.

46.     Since at least July 16, 2008, Defendants have medically disqualified from employment a class of presently unidentified employees with actual disabilities, and whom they regarded as disabled, because Defendants deemed those persons to have uncontrolled diabetes, without consideration of whether, or to what extent, their diabetes or glucose levels actually affected their ability to safely perform the essential functions of the positions they held.

47.     Defendants failed to provide reasonable accommodation to a class of job

applicants and employees for their disabilities (diabetes), in the form of an exemption from

Defendants' blanket policy and practice, based on an individualized assessment of the job

applicants' and employees' actual experience with the effects (or lack thereof) of their diabetes.

48.    Defendants refused to hire a class of presently unidentified job applicants on the

basis of actual disability, diabetes, and because they were regarded as disabled in violation of

Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a),

12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

49.    Defendants medically disqualified from employment a class of presently

unidentified employees on the basis of actual disability, diabetes, and because they were

regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the

ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Class of Employees and Job Applicants Disqualified for</u>
<u>Past Drug Addiction, Drug Addiction Recovery, and Treatment for Drug Addiction</u>

50.    Since at least July 16, 2008, Defendants maintained and applied a medical

standard that barred job applicants and employees in certain positions from working in those

positions if they were currently taking prescribed medications for drug addiction treatment, such

as suboxone or methadone, or if, at the time of their medical evaluation by Defendants, it had

been less than one year since they last took such medications, regardless of the actual effect of

such medications or time period being off such medications had on the individual job applicants'

or employees' ability to safely perform the essential functions of the jobs at issue.

51.    Since at least July 16, 2008, Defendants maintained and applied a medical

standard that barred job applicants and employees in certain positions from working in those

positions until at least one year after their completion drug addiction treatment without any

relapses, regardless of the individual job applicants' or employees' ability to safely perform the

essential functions of the jobs at issue.

52.     Since at least July 16, 2008, Defendants have refused to hire a class of presently unidentified job applicants with actual disabilities, records of disability, and whom they regarded as disabled, because of past drug addiction, drug addiction recovery and related treatment, without consideration of whether, or to what extent, those impairments and treatment actually affected their ability to safely perform the essential functions of the positions they sought.

53.     Since at least July 16, 2008, Defendants have medically disqualified from employment a class of presently unidentified employees with actual disabilities, records of disability, and whom they regarded as disabled, because of past drug addiction, drug addiction recovery and related treatment, without consideration of whether, or to what extent, those impairments and treatment actually affected their ability to safely perform the essential functions of the positions they held.

54.     Defendants refused to hire a class of presently unidentified job applicants described above on the basis of actual disability, record of disability, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

55.     Defendants medically disqualified from employment a class of presently unidentified employees described above on the basis of actual disability, record of disability, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Jonathan Ryan</u>

56.     At all relevant times, Jonathan Ryan was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded

Ryan as having a disability by medically disqualifying him and denying him hire as a track laborer because of his non-transitory and non-minor impairment, rheumatoid arthritis.

57.     Ryan applied for a track laborer position at Defendants' Pittsburgh, Pennsylvania facility in November 2011.

58.     Defendants required Ryan to undergo a pre-employment medical examination and inquiries during which he disclosed that he has rheumatoid arthritis.  Ryan was first diagnosed with rheumatoid arthritis approximately five years before applying for work with Defendants. Ryan was cleared to work by the examining physician, as well as his own personal rheumatologist.

59.     Despite the fact that Ryan had been cleared to work, Defendants, acting through NSMD, refused to hire him because of his rheumatoid arthritis.  Dr. Ray Prible, Defendants' medical director, told Ryan in a telephone call that he believed Ryan could do the job of a track laborer at the time but that Prible was concerned about Ryan's ability to do the job at some unspecified time in the future.

60.     Defendants' conduct regarding Ryan violated Sections 102(a) and 102(b)(1), of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

<u>Anthony Wooten</u>

61.     At all relevant times, Anthony Wooten was a person with a disability under Section 3(1)(B) and (C) of the ADA, 42 U.S.C. § 12102(1)(B) & (C).  Wooten had a record of a disability, arthritis resulting in a total hip replacement, that substantially limited a major life activity.  Defendants, acting through NSMD, also regarded Wooten as having a disability by medically disqualifying him and denying him hire as a locomotive painter/fireman and oiler because of his non-transitory and non-minor impairment, arthritis resulting in a total hip

12

replacement.

62.    Wooten began experiencing significant pain and other symptoms related to his hip in 2000.  Prior to having hip replacement surgery in 2005, Wooten was told by his surgeon that he had degenerative arthritis.

63.    Wooten applied for a locomotive painter position at Defendants' Chattanooga, Tennessee facility in 2010.  Wooten applied for a locomotive painter position, but Defendants' medical department records identify the position as a fireman and oiler.

64.    After being cleared for work following a pre-employment medical examination, Defendants required Wooten to provide medical records relating to his hip impairment. Defendants also inquired of Wooten's orthopedic surgeon, who stated that Wooten could safely perform the duties of the position in question.

65.    Nevertheless, Defendants, acting through NSMD, medically disqualified Wooten from employment and denied him hire because of his impairment.  Defendants' medical director, Dr. Ray Prible, expressed concern that temporary pain and stiffness Wooten had experienced in the past after climbing ladders for 12 hours in other jobs for other employers might be construed as an occupational injury while employed by Defendants.

66.     Defendants refused to hire Wooten because of his record of disability and because he was regarded as disabled.

67.    Defendants' conduct regarding Wooten violated Sections 102(a) and 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

<u>Class of Employees and Job Applicants Disqualified for
Forms of Arthritis and Related Medical Conditions</u>

68.    Since at least July 16, 2008, Defendants have refused to hire a class of presently unidentified job applicants with actual disabilities, and whom they regarded as disabled, because

those persons had arthritis or related conditions, without consideration of whether, or to what extent, their arthritis or related conditions actually affected their ability to safely perform the essential functions of the positions they sought.

69.     Since at least July 16, 2008, Defendants have medically disqualified from employment a class of presently unidentified employees with actual disabilities, and whom they regarded as disabled, because those persons had arthritis or had related medical conditions, without consideration of whether, or to what extent, those impairments actually affected their ability to safely perform the essential functions of the positions they held.

70.     Defendants refused to hire a class of presently unidentified job applicants on the basis of actual disability, arthritis, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

71.     Defendants medically disqualified from employment a class of presently unidentified employees on the basis of actual disability, arthritis, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Robert Garrity</u>

72.     At all relevant times, Robert Garrity has been a person with a disability under Section 3(1)(B) & (C) of the ADA, 42 U.S.C. § 12102(1)(B) & (C).  Garrity had a record of a disability, a herniated disc in his back, that substantially limited one or more major life activities. Defendants, acting through their internal medical department, also regarded Garrity as having a disability by medically disqualifying him and denying him hire as a conductor because of his non-transitory and non-minor back impairment.

73.     In 2007, while playing college football, Garrity injured his back, resulting in herniated discs in his lower back.  Garrity received treatment, including injections and physical therapy, for more than a year, ceasing treatment in 2008.

74.     Garrity applied twice for a conductor position with Defendants in Pittsburgh, once in July 2010 and again in June 2011, receiving a conditional offer of employment each time.

75.     After receiving each conditional offer of employment, Defendants required Garrity to undergo a medical examination conducted by a contract physician.  In July 2010, on forms containing inquiries related to the medical examination, Garrity disclosed that he had experienced a herniated disc in his back in 2007, for which he received treatment and from which he fully recovered.

76.     The contract physicians medically cleared Garrity to work as a conductor in both 2010 and 2011, but NSMD required Garrity to provide additional information, including medical records.  Garrity provided those records, as well as letters from his family physician neurosurgeon, who cleared him for work.

77.     Despite Garrity being cleared by several physicians, Defendants, acting though NSMD, medically disqualified him and he was not hired because of the herniated disc in his back.

78.     Defendants refused to hire Garrity on the basis of his disability and because he was regarded as disabled.

79.     Defendants' conduct regarding Garrity violated Sections 102(a) & 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).


Matthew Kelley

80.     At all relevant times, Matthew Kelley was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Kelley as having a disability by medically disqualifying him and denying him hire as a conductor because Defendants believed he had a non-transitory and non-minor impairment, degenerative disc disease.

81.     In 2011, Kelley applied for a conductor position at Defendants' Atlanta facility.

82.     Kelley disclosed during his pre-employment medical examination that he had experienced neck pain five years before his application and had received two injections to relieve the pain.  He indicated that he had no further treatment.  Kelley was not told by his doctors that he had degenerative disc disease.

83.     The examining physician and the contract physician cleared him to work.

84.     Despite having not received any treatment for years, Defendants, acting through NSMD, medically disqualified Kelley from hire as a conductor because of his neck injury, which NSMD perceived to be degenerative disc disease that would worsen over time.

85.     Defendants refused to hire Kelley because he was regarded as disabled.

86.     Defendants' conduct regarding Kelley violated Sections 102(a) & 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

<u>Christopher Kososki</u>

87.     At all relevant times, Christopher Kososki was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Kososki as having a disability by medically disqualifying him and denying him hire as a conductor because Defendants believed he had a non-transitory and non-minor impairment, chronic lumbar myositis and radiculopathy.

88.     In 2012, Kososki applied for a conductor position at Defendants' Dearborn, Michigan facility.

89.     Kososki disclosed during his pre-employment medical examination that he experienced lower back pain in March/April of 2012, and again in June 2012.  Kososki was cleared to work by the contract physician who examined him.

90.     Defendants, through NSMD, required Kososki to provide medical records, which indicated that his back condition had resolved.  Despite this, NSMD perceived Kososki to suffer from recurrent lumbar myositis and radiculopathy, medically disqualified him, and denied him hire as a conductor.

91.     Defendants refused to hire Kososki because he was regarded as disabled.

92.     Defendants' conduct regarding Kososki violated Sections 102(a) & 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

<u>Robert Lee</u>

93.     At all relevant times, Robert Lee was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Lee as having a disability by medically disqualifying him and denying him hire as a conductor because of a non-transitory and non-minor impairment, a bulging lumbar disc.

94.     Lee applied for a conductor position at Defendants' Roanoke, Virginia facility in 2011.

95.     Defendants required Lee to undergo a pre-employment medical examination, and during the examination and related inquiries he disclosed a prior lower back condition.  Lee also provided a letter from his neurosurgeon, who stated that Lee's bulging disc had resolved and had been stable for a year, clearing him for work as a conductor.

96.     Despite Lee having been cleared for work by two physicians, Defendants, acting through NSMD, medically disqualified him and denied him hire as a conductor because of his bulging lumbar disc.

97.     Defendants refused to hire Lee because he was regarded as disabled.

98.     Defendants' conduct regarding Lee violated Sections 102(a) & 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

Zenas Dowdell

99.     At all relevant times, Zenas Dowdell has been a person with a disability under Section 3(1)(A) & (C) of the ADA, 42 U.S.C. § 12102(1)(A) & (C).  Dowdell has a physical impairment, diabetes, that substantially limits one or more major life activities and Defendants, acting through NSMD, regarded Dowdell as having a disability by medically disqualifying him and refusing to hire him because of his non-transitory and non-minor impairments, hypertension, a back condition, and diabetes.

100.    Dowdell applied for a paid summer internship with Defendants' human resources department in Norfolk, Virginia in the spring of 2012.

101.    Defendants subsequently required Dowdell to undergo a medical examination and inquiries, during which he disclosed that he has diabetes, which was first diagnosed in 2009.  He also disclosed that he suffered from hypertension and that he had a prescription for Tylenol #3.

102.    Thereafter, Defendants, acting through NSMD, requested extensive medical records relating to his diabetes, hypertension and medication use.  Dowdell provided the requested documentation, as well as a note from his personal physician clearing him to work without restriction.  Defendants then requested records relating to treatment Dowdell received for a strained back.

103.    After receiving the aforementioned records, Defendants, acting through NSMD, disqualified Dowdell and he was denied hire because of his back condition, hypertension and diabetes.

104.    Defendants refused to hire Dowdell on the basis of his disability and because he was regarded as disabled.

105.    Defendants' conduct regarding Dowdell violated Sections 102(a) and 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

<u>Randy Nosal</u>

106.    At all relevant times, Randy Nosal was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Nosal as having a disability by medically disqualifying him and denying him hire as a machinist because he had a non-transitory and non-minor impairment, chronic back and wrist pain.

107.    Nosal applied for a machinist position at Defendants' Harrisburg, Pennsylvania facility in 2011.

108.    During his pre-employment medical examination, Nosal disclosed that he had a work-related disc herniation in his lumbar spine in 2000, that he had undergone two surgeries to his wrist in 2007, and that he took Tramadol for long-standing pain management.

109.    In a letter dated April 13, 2011, Defendants, acting through NSMD, requested records from Nosal relating to his back and wrist injuries, and also informed Nosal that Defendants' policy prohibited use of Tramadol within six hours of a work shift.

110.    Nosal provided the requested records, including notes from an examination by his own physician that he reported "mild tenderness at L4-L5" in his back and that he had a "history of chronic low back pain and right wrist pain."

111.    Nosal's personal physician cleared him for work, and both he and Nosal stated that Nosal would cease taking Tramadol to comply with Defendants' drug policy.  Despite this, NSMD medically disqualified Nosal, and he was denied hire as a machinist.

112.    Defendants refused to hire Nosal because he was regarded as disabled.

113.    Defendants' conduct regarding Nosal violated Sections 102(a), 102(b)(1), and 102(b)(6) of the ADA, 42 U.S.C. §§12112(a), 12112(b)(1), & 12112(b)(6).

Noah Wright

114.    At all relevant times, Noah Wright was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Wright as having a disability by medically disqualifying him and denying him hire as a conductor because Defendants believed he had a non-transitory and non-minor impairment, knee instability.

115.    Wright applied for a conductor position at Defendants' Knoxville, Tennessee facility in 2011.

116.    Wright disclosed prior knee injuries at the time of his pre-employment medical examination.  Wright never needed surgery for his knee injuries.  The contract physician who examined Wright cleared him for work as a conductor.

117.    At Defendants' request, Wright provided medical records, which included recent notes from his orthopedic specialist indicating no tenderness, irritation or swelling.

118.    Despite Wright having been cleared for work by the examining physician, and receiving medical records showing Wright had no lingering knee impairment, Defendants, through NSMD, medically disqualified him and denied him hire as a conductor because they regarded him as disabled.

20

119.   Defendants refused to hire Wright because he was regarded as disabled.

120.   Defendants' conduct regarding Wright violated Sections 102(a) & 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

Class of Employees and Job Applicants Disqualified for
Non-Paralytic Orthopedic Impairments and Related Conditions

121.   Since at least July 16, 2008, Defendants have refused to hire a class of presently unidentified job applicants with actual disabilities, and whom they regarded as disabled, because those persons had non-paralytic orthopedic impairments or related conditions, without consideration of whether, or to what extent, those impairments and conditions actually affected their ability to safely perform the essential functions of the positions they sought.

122.   Since at least July 16, 2008, Defendants have medically disqualified from employment a class of presently unidentified employees with actual disabilities, and whom they regarded as disabled, because those persons had non-paralytic orthopedic impairments or related conditions, without consideration of whether, or to what extent, those impairments and conditions actually affected their ability to safely perform the essential functions of the positions they held.

123.   Defendants refused to hire a class of presently unidentified job applicants on the basis of actual disability, non-paralytic orthopedic impairments or related conditions, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

124.   Defendants medically disqualified from employment a class of presently unidentified employees on the basis of actual disability, non-paralytic orthopedic impairments or related conditions, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1),

12112(b)(5)(A) & 12112(b)(6).

<u>Robert Workman</u>

125.    At all relevant times, Robert Workman was a person with a disability under

Section 3(1)(A) and (C) of the ADA, 42 U.S.C. § 12102(1)(A) & (C).  At the time of his

employment with Defendants, Workman had a physical impairment, chronic systolic heart

failure, that substantially limited one or more major life activities, and Defendants, acting

through their internal medical department, regarded Workman as having a disability by

medically disqualifying him and placing him on indefinite, unpaid medical suspension as a

conductor, because of his non-transitory and non-minor impairment, chronic systolic heart

failure.

126.    Workman was initially hired in 2003, and worked as a conductor out of

Defendants' Cincinnati, Ohio facility.

127.    In May 2009, Workman was suspended due to a non-health related matter.  After

successfully appealing his suspension, Workman was required to undergo a fitness for duty

medical examination because he had been off work for more than 90 days.

128.    As a result of the aforementioned medical examination, and a review of extensive

medical records that Defendants required Workman to provide, Defendants learned that

Workman's heart ejection fraction was 31%.

129.    According to Defendants' medical standards, Workman was required to have an

ejection fraction of 40% to return to work.

130.    Since Workman did not meet the aforementioned medical standard, he was placed

on indefinite, unpaid medical suspension and was not permitted to return to work as a conductor.

131.    At the time of his hire in 2003, Defendants were provided with medical records

that showed that Workman's ejection fraction was under 40%, and he was approved for hire.  In May 2010, Workman's cardiologist cleared him to work without restrictions.  Defendants disregarded the cardiologist's opinion, and maintained Workman's suspension from his job as a conductor.

132.    At all relevant times, Defendants maintained and applied a medical standard that bars employees in certain positions, including but not limited to conductors, from working if they have ejection fractions below 40%, regardless of the actual effect of such levels on the individual employee's ability to safely perform the essential functions of the job.

133.    Defendants placed Workman on unpaid medical suspension because of his chronic systolic heart failure pursuant to the policy described above.  Defendants failed to provide reasonable accommodation to Workman for his disability, in the form of an exemption from their blanket policy, based on an individualized assessment of Workman's actual experience with the effects (or lack thereof) of his chronic systolic heart failure.

134.    Defendants placed Workman on unpaid medical suspension because of his actual disability and because he was regarded as disabled.

135.    Defendants' conduct regarding Workman violated Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Jesse Blankenship</u>

136.    At all relevant times, Jessie Blankenship has been a person with a disability under Section 3(1)(A) & (C) of the ADA, 42 U.S.C. § 12102(1)(A) & (C).  Blankenship has a physical impairment, coronary artery disease with ischemia, that substantially limits one or more major life activities and Defendants, acting through NSMD, regarded Blankenship as having a

disability by medically disqualifying him from his job, and placing him on unpaid, indefinite medical suspension, because of his non-transitory and non-minor impairment.

137. Blankenship was employed by Defendants as a machinist in 2004. For several years, Blankenship worked on locomotives at Defendants' Roanoke, Virginia locomotive shop. Blankenship later was assigned to the "diesel shop," where he worked on engines.

138. In September 2008, while assigned to Defendants' diesel shop, Blankenship underwent emergency cardiac surgery, and was on a medical leave of absence until March 23, 2009, when his cardiologist released him to return to work without restrictions.

139. Thereafter, Defendants refused to return Blankenship to work, and by letter from NMSD dated August 4, 2009, medically disqualified him from his job, and suspended him indefinitely without pay, because of his physical impairment.

140. At all relevant times, Defendants maintained and applied a medical standard that employees in certain positions, including but not limited to machinists, be free of cardiac ischemia.

141. Defendants removed Blankenship from his position as a machinist because he could not demonstrate that he was or would be free of cardiac ischemia.

142. Defendants placed Blankenship on unpaid medical suspension because of his cardiac ischemia pursuant to the policy described above. Defendants failed to provide reasonable accommodation to Blankenship for his disability, in the form of an exemption from their blanket policy, based on an individualized assessment of Blankenship's actual experience with the effects (or lack thereof) of his chronic systolic heart failure.

143. Defendants placed Blankenship on unpaid medical suspension because of his actual disability and because he was regarded as disabled.

144.    Defendants' conduct regarding Blankenship violated Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

### Philip Tyson

145.    At all relevant times, Philip Tyson was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Tyson as having a disability by medically disqualifying him and denying him hire as a track laborer because of his non-transitory and non-minor impairment, atrial fibrillation.

146.    Tyson applied for a forklift mechanic position at Defendants' Norfolk, Virginia facility in 2014.  At the time of his application for employment with Defendants, Tyson had worked as a forklift mechanic for 30 years.

147.    After being cleared for work following a pre-employment medical examination, Tyson was required to provide medical records relating to his impairment.

148.    Defendants, through NSMD, then medically disqualified Tyson from employment and denied him hire as a forklift mechanic because of his impairment.

149.    Defendants refused to hire Tyson because he was regarded as disabled.

150.    Defendants' conduct regarding Tyson violated Sections 102(a) and 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

### Rashad Robinson

151.    At all relevant times, Rashad Robinson was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Robinson as having a disability by medically disqualifying him from his job, and placing him on unpaid, indefinite medical suspension, because of his non-transitory and non-

minor impairment, bullous emphysema.

152.   Robinson was hired by Defendants as a conductor in 2005, working out of Defendants' Linwood and Greensboro, North Carolina facilities.

153.   In 2008, Robinson was diagnosed with bullous emphysema, a condition that did not affect his ability to perform the essential functions of his job.  At that time, Robinson took a medical leave of absence related to his lung condition, and Defendants, through NSMD, were aware of his physical impairment because NSMD cleared him to return to work following that medical leave.

154.   In early 2010, Robinson took a short medical leave of absence for an unrelated condition.  When that condition resolved, his physician cleared him to return to work, but Defendants, through NSMD, placed Robinson on a "medical hold," an unpaid suspension, and required Robinson to provide medical documentation related to his bullous emphysema.

155.   Defendants' request for medical records was not job-related and consistent with business necessity, as Defendants had no objective evidence to indicate that Robinson was unable to safely perform the essential functions of his job, his leave of absence was unrelated to his impairment, and there was no reason to believe his bullous emphysema had changed.

156.   The medical records that Robinson provided to Defendants showed that there was no significant change in his condition related to his bullous emphysema.

157.   Nevertheless, Defendants refused to return Robinson to work, and by letter from NMSD dated July 24, 2010, they medically disqualified him from his job as a conductor, and suspended him indefinitely from that position without pay, because of his physical impairment.

158.   Defendants subjected Robinson to unpaid, indefinite suspension because he was regarded as disabled.

159.    Defendants also subjected Robinson to an illegal medical inquiry, and used the results of that inquiry to place Robinson on an unpaid, indefinite suspension.

160.    Defendants' conduct regarding Robinson violated Sections 102(a), 102(b)(1) and 102(d)(4) of the ADA, 42 U.S.C. §§12112(a), 12112(b)(1) and 12112(d)(4).

<u>Class of Employees and Job Applicants Disqualified for Cardiopulmonary<br>and Cardiovascular Impairments and Related Conditions</u>

161.    Since at least July 16, 2008, Defendants maintained and applied a medical standard that barred job applicants and employees in certain positions from working in those positions if they did not have a heart ejection fraction of at least 40%, regardless of the actual effect of levels below 40% on the individual job applicant's or employee's ability to safely perform the essential functions of the job.

162.    Since at least July 16, 2008, Defendants maintained and applied a medical standard that barred job applicants and employees in certain positions from working in those positions if they are not free of cardiac ischemia, regardless of the actual effect of such cardiac ischemia on the individual job applicant's or employee's ability to safely perform the essential functions of the job.

163.    Since at least July 16, 2008, Defendants have refused to hire a class of presently unidentified job applicants with actual disabilities, and whom they regarded as disabled, because those persons had cardiopulmonary or cardiovascular impairments or related conditions, without consideration of whether, or to what extent, those impairments and conditions actually affected their ability to safely perform the essential functions of the positions they sought.

164.    Since at least July 16, 2008, Defendants have medically disqualified from employment a class of presently unidentified employees with actual disabilities, and whom they regarded as disabled, because those persons had cardiopulmonary or cardiovascular impairments

or related conditions, without consideration of whether, or to what extent, those impairments and conditions actually affected their ability to safely perform the essential functions of the positions they held.

165.    Defendants refused to hire a class of presently unidentified job applicants on the basis of actual disability, cardiopulmonary or cardiovascular impairments or related conditions, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

166.    Defendants medically disqualified from employment a class of presently unidentified employees on the basis of actual disability, cardiopulmonary or cardiovascular impairments or related conditions, and because they were regarded as disabled in violation of Sections 102(a), 102(b)(1), 102(b)(5)(A) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(1), 12112(b)(5)(A) & 12112(b)(6).

<u>Michael Davis</u>

167.    At all relevant times, Michael Davis has been a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through their internal medical department, regarded Davis as having a disability by medically disqualifying him from employment as a track laborer because Defendants believed he had a non-minor and non-transitory impairment, insomnia.

168.    In 2011, Davis applied for a track laborer position with Defendants in Norfolk, Virginia and received a conditional offer of employment.

169.    After receiving a conditional offer of employment, Davis was required to undergo a medical examination and inquires performed by a contract physician, who medically cleared

Davis for the job.  Despite this, because Davis disclosed on medical forms that he had taken medication on occasion for sleeplessness, NSMD required him to undergo additional testing, including a sleep test that he had to pay for himself and which he passed.

170.    NSMD believed that Davis had chronic insomnia, lasting for a period of 10 to 12 years, when Davis had no such history of insomnia.

171.    Based on their belief that Davis had chronic insomnia, Defendants, acting through NSMD, medically disqualified him from employment and denied him hire as a track laborer.

172.    Defendants' conduct regarding Davis violated Sections 102(a) & 102(b)(1) of the ADA, 42 U.S.C. §§12112(a) & 12112(b)(1).

<u>Adam Worthing</u>

173.    At all relevant times, Adam Worthing was a person with a disability under Section 3(1)(C) of the ADA, 42 U.S.C. § 12102(1)(C).  Defendants, acting through NSMD, regarded Worthing as having a disability by medically disqualifying him and denying him hire as a signal trainee because he was regarded as having a non-transitory and non-minor impairment, post-traumatic stress disorder (PTSD).

174.    Worthing applied for a signal trainee position at Defendants' Altoona, PA facility in 2011.

175.    Defendants required Worthing to undergo a pre-employment medical examination, and he was cleared for work.

176.    However, Defendants, through NSMD, also required Worthing to provide medical records related to past treatment, which Defendants wrongly believed indicated that he was previously diagnosed as having PTSD.

177.    Worthing is an Iraq War veteran and attended one counseling session as a result

of nightmares and hyper-vigilance he experienced when he returned from Iraq.  He was never informed by any medical provider that he was diagnosed with PTSD, and he did not receive treatment for PTSD.

178.    Defendants, acting through NSMD, medically disqualified Worthing and denied him hire as a signal trainee because they regarded him as disabled.

179.    Defendants' conduct regarding Worthing violated Sections 102(a), 102(b)(1) & 102(b)(6) of the ADA, 42 U.S.C. §§12112(a), 12112(b)(1) & 12112(b)(6).

180.    The effect of the practices complained of in paragraphs 20 through 179 above has been to deprive each of the individuals identified herein, and a class of presently unidentified individuals, of equal employment opportunities and otherwise adversely affect their ability to become employees or retain their employment because of their disabilities.

181.    The unlawful employment practices complained of in paragraphs 20 through 179 above were intentional.

182.    The unlawful employment practices complained of in paragraphs 20 through 179 above were done with malice or with reckless indifference to the federally protected rights of each of the individuals identified herein, and a class of presently unidentified individuals.

<u>PRAYER FOR RELIEF</u>

Wherefore, the Commission respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from engaging in discrimination by refusing to hire individuals and/or suspending employees with disabilities, and from maintaining or enforcing qualification standards that screen out or have a tendency to screen out individuals with disabilities.

B.      Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for individuals with disabilities, and which eradicate the effects of their past and present unlawful employment practices.

C.      Order Defendants to make whole each of the individuals identified herein, and a class of presently unidentified individuals, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to instatement or reinstatement and front pay.

D.      Order Defendants to make whole each of the individuals identified herein, and a class of presently unidentified individuals, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 20 through 182 above, including but not limited to job search expenses and medical expenses not covered by the Defendants' employee benefit plan, in amounts to be determined at trial.

E.      Order Defendants to make whole each of the individuals identified herein, and a class of presently unidentified individuals, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs 20 through 182 above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

F.      Order Defendants to pay each of the individuals identified herein, and a class of presently unidentified individuals, punitive damages for malicious and reckless conduct, as described in paragraphs 20 through 182 above, in amounts to be determined at trial.

G.      Grant such further relief as the Court deems necessary and proper in the public interest.

H.     Award the Commission its costs of this action.

### JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its complaint.

Respectfully submitted,

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

JAMES L. LEE
ACTING GENERAL COUNSEL

GWENDOLYN YOUNG REAMS
ASSOCIATE GENERAL COUNSEL
WASHINGTON, D.C.

DEBRA M. LAWRENCE
REGIONAL ATTORNEY
EEOC – Philadelphia District Office
City Crescent Building, 3rd Floor
10 South Howard Street
Baltimore, MD 21201
(410) 209-2734
(410) 962-4270 (facsimile)

RONALD L. PHILLIPS
SUPERVISORY TRIAL ATTORNEY
EEOC – Baltimore Field Office
City Crescent Building, 3rd Floor
10 South Howard Street
Baltimore, MD 21201
(410) 209-2737
(410) 962-4270 (facsimile)
ronald.phillips@eeoc.gov

DEBORAH A. KANE
SENIOR TRIAL ATTORNEY
Pa. I.D. No. 92531
EEOC – Pittsburgh Area Office
1000 Liberty Avenue, Suite 1112

Pittsburgh, PA 15222
(412) 395-5866
(412) 395-5749 (facsimile)
deborah.kane@eeoc.gov

CATHERINE N. SELLERS
TRIAL ATTORNEY
Wa. I.D. No. 44563
EEOC – Baltimore Field Office
City Crescent Building, 3rd Floor
10 South Howard Street
Baltimore, MD 21201
(410) 209-2233
(410) 962-4270 (facsimile)
catherine.sellers@eeoc.gov